# 25-437

*To Be Argued By*:
RYAN W. ALLISON

# United States Court of Appeals
## FOR THE SECOND CIRCUIT
### Docket No. 25-437

◄◄►►►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JUSTIN TURNICK,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

JAY CLAYTON,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

RYAN W. ALLISON,
NATHAN REHN,
*Assistant United States Attorneys,
Of Counsel*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    A.  The Offense Conduct . . . . . . . . . . . . . . . . . .   2

        1.  The Death of Gustaf Olsen . . . . . . . . . .   3

        2.  The Death of Jonathan Shashoua . . . .   3

        3.  The Poisoning of Rachel Goldsmith . . .   4

        4.  The Death of Ione Koenig . . . . . . . . . . .   5

        5.  The Poisoning of Joseph Doria . . . . . . .   6

    B.  Turnick's Guilty Plea . . . . . . . . . . . . . . . . .   6

    C.  The Sentencing Proceeding . . . . . . . . . . . . .   8

ARGUMENT:

POINT I—The District Court Did Not Err in
    Finding that Turnick's DWAI Conviction
    Warranted One Criminal History Point
    Under U.S.S.G. § 4A1.2(c). . . . . . . . . . . . . . . .   12

    A.  Factual and Statutory Background . . . . . .   13

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .   14

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .   17

        1.  The District Court Did Not Err
           Under the Current Sentencing
           Guidelines' Application Notes. . . . . . .   17

ii

PAGE

2. The District Court Did Not Err Under the Approach Outlined in *Potes-Castillo* . . . . . . . . . . . . . . . . . . 22

    a. The Due Deference Standard of Review Applies . . . . . . . . . . . . . . 22

    b. The District Court Did Not Err in Concluding that Turnick's DWAI Conviction Was Not Similar to the Offenses Listed in U.S.S.G. § 4A1.2(c)(1) and (2) . . . . . . . . . . . 24

POINT II—The Government Did Not Breach the Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

  A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 29

  B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**TABLE OF AUTHORITIES**

*Cases*:

*Gonzalez v. United States*,
No. 14 Civ. 8760, 2016 WL 270451
(S.D.N.Y. Jan. 21, 2016) . . . . . . . . . . . . . . . . . . . . . 25

*New York v. Lizzio*,
178 A.D.2d 741 (N.Y. App. Div. 1991) . . . . . . . . . 14

iii

PAGE

*New York v. Marriot,*
    37 A.D.2d 868 (N.Y. App. Div. 1971) . . . . . . . . . . 14

*New York v. Miller,*
    373 N.Y.S.2d 312 (Webster Town Ct. 1975) . 14, 23

*New York v. O'Connor,*
    607 N.Y.S.2d 856 (Nassau Cty. Dist. Ct. 1994) . 14

*Puckett v. United States,*
    556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . 30, 31

*Stinson v. United States,*
    508 U.S. 36 (1993). . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Amico,*
    416 F.3d 163 (2d Cir. 2005) . . . . . . . . . . . . . . 30, 33

*United States v. Casamento,*
    887 F.2d 1141 (2d Cir. 1989) . . . . . . . . . . . . . . . 36

*United States v. Cimino,*
    381 F.3d 124 (2d Cir. 2004) . . . . . . . . . . . . . . . . 30

*United States v. Deigert,*
    916 F.2d 916 (4th Cir. 1990) . . . . . . . . . . . . . . . 18

*United States v. DeJesus-Concepcion,*
    607 F.3d 303 (2d Cir. 2010) . . . . . . . . . . . . . *passim*

*United States v. Lawlor,*
    168 F.3d. 633 (2d Cir. 1999). . . . . . . . . . . . . . . . 30

*United States v. LeBlanc,*
    45 F.3d 192 (7th Cir. 1995) . . . . . . . . . . . . . . . . 18

iv

PAGE

*United States v. Luizzi,*
No. 24-2728, 2025 WL 2992462
(2d Cir. Oct. 24, 2025). . . . . . . . . . . . . . . . . . . . . . 26

*United States v. MacPherson,*
590 F.3d 215 (2d Cir. 2009) . . . . . . . . . . . . . . . . 30

*United States v. Marcus,*
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . 31, 32, 35

*United States v. Martinez-Santos,*
184 F.3d 196 (2d Cir. 1999) . . . . . . . . . . . . . . . . 16

*United States v. Morales,*
239 F.3d 113 (2d Cir. 2000) . . . . . . . . . . . . . *passim*

*United States v. Palladino,*
347 F.3d 29 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 33

*United States v. Pando,*
545 F.3d 682 (8th Cir. 2008) . . . . . . . . . . . . . . . 18

*United States v. Paredes,*
185 F. Supp. 3d 287 (E.D.N.Y. 2016). . . . . . . . . . 23

*United States v. Perez,*
No. 24 Cr. 368, 2025 WL 2047829
(S.D.N.Y. July 22, 2025). . . . . . . . . . . . . . . . . . . . 20

*United States v. Potes-Castillo,*
638 F.3d 106 (2d Cir. 2011) . . . . . . . . . . . . . *passim*

*United States v. Riera,*
298 F.3d 128 (2d Cir. 2002) . . . . . . . . 29, 30, 32, 35

*United States v. Taylor,*
961 F.3d 68 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 30

v

PAGE

*United States v. Thornton,*
   444 F.3d 1163 (9th Cir. 2006) . . . . . . . . . . . . . . . 18

*United States v. Ubiera,*
   486 F.3d 71 (2d Cir. 2007) . . . . . . . . . . .  15, 16, 27

*United States v. Valente,*
   688 F. App'x 76 (2d Cir. 2017) . . . . .  18, 22, 23, 26

*United States v. Valente,*
   915 F.3d 916 (2d Cir. 2019) . . . . . . .  15, 16, 23, 27

*United States v. Walia,*
   No. 14 Cr. 213, 2016 WL 4257347
   (E.D.N.Y. Aug. 11, 2016) . . . . . . . . . . . . . . . . . . . 23

*United States v. Whab,*
   355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 31

*United States v. Wilson,*
   920 F.3d 155 (2d Cir. 2019) . . . . . . . . . . . . . . 29, 37

*United States v. Vaval,*
   404 F.3d 144 (2d Cir. 2005) . . . . . . . . . .  30, 36, 37

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3742(e) . . . . . . . . . . . . . . . . . . . . . . . . 17, 26

Fed. R. Crim. P. 51(b) . . . . . . . . . . . . . . . . . . . . . . . 31

U.S.S.G. § 4A1.2 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 25-437

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JUSTIN TURNICK,

*Defendant-Appellant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Justin Turnick appeals from a judgment of conviction entered on February 20, 2025, in the United States District Court for the Southern District of New York, by the Honorable Philip M. Halpern, United States District Judge, following Turnick's guilty plea.

Information S1 23 Cr. 344 (PMH) (the "Information") was filed on August 6, 2024, in one count, which charged Turnick with conspiring to distribute forty grams and more of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B).

On February 20, 2025, Judge Halpern sentenced Turnick to a term of 262 months' imprisonment, to be

2

followed by five years' supervised release, and imposed a $100 mandatory special assessment.

Turnick is serving his sentence.

## Statement of Facts

### A. The Offense Conduct

From at least February 2020 through at least June 2023, Turnick sold and otherwise distributed narcotics in Rockland County, New York, with at least two other co-conspirators. Turnick sold and distributed, among other types of narcotics, fentanyl, fentanyl-laced Percocet pills, fentanyl-laced Xanax pills, fentanyl-laced Klonopin pills, fentanyl-laced heroin, and fentanyl-laced cocaine. Turnick sold narcotics to, among others, his friends, customers, romantic partners, and others in his circle. (PSR ¶ 9).[1]

Turnick's drug distribution resulted in three fatal and three non-fatal fentanyl poisonings:[2] (1) the death

---

[1] "Br." refers to Turnick's brief on appeal; "A." refers to the appendix filed with that brief; "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the Probation Office in connection with Turnick's sentencing; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, quotations omit internal quotation marks, citations, and prior alterations.

[2] At the request of the victims' families, the Government refers to these injuries as "fentanyl poisonings" rather than "overdoses." (*See* A. 79 n.1).

3

of Gustaf Olsen on February 3, 2020; (2) the death of Jonathan Shashoua on July 11, 2020; (3) serious bodily injury to Rachel Goldsmith on January 5, 2021; (4) serious bodily injury to Ione Koenig on July 30, 2021; (5) the death of Ione Koenig on July 31, 2021; and (6) serious bodily injury to Joseph Doria on April 19, 2022.

### 1.   The Death of Gustaf Olsen

In early February 2020, Turnick sold pills to a former classmate, Gustaf Olsen, and Olsen's girlfriend ("AD"). The pills included one hundred pills that Turnick described as Klonopin and ten pills he described as Percocet. (PSR ¶¶ 12-13). On February 2, 2020, Olsen and AD used the pills Turnick had sold them, as well as other drugs. (PSR ¶ 14).

The next morning, AD woke to the sound of gurgling noises coming from Olsen's mouth. AD looked behind her and saw blood leaking out of Olsen's nose onto her sheets. Olsen was experiencing a fatal fentanyl poisoning caused by the pills Turnick had sold him, and he died shortly thereafter. (PSR ¶¶ 15, 16).

### 2.   The Death of Jonathan Shashoua

In March 2020, about a month after Olsen's death, Turnick started selling drugs to his twenty-two-year-old former classmate, Jonathan Shashoua. (PSR ¶¶ 18-20). In June 2020, Shashoua had completed a month-long term at an in-patient drug treatment facility and returned home. (PSR ¶¶ 20-22). Almost immediately thereafter, Turnick started supplying Shashoua with drugs, and he continued doing so for several weeks. (PSR ¶ 22). On July 10, 2020, Turnick sold

4

Shashoua fentanyl. (PSR ¶ 23). The next morning, Shashoua's mother found her son unresponsive in his room at their home. Shashoua had collapsed face down next to his bedroom door. Shashoua had died from a fentanyl poisoning caused by Turnick's drugs. (PSR ¶ 24).

### 3. The Poisoning of Rachel Goldsmith

Several months later, on January 5, 2021, Turnick gave fentanyl to his off-and-on romantic partner, eighteen-year-old Rachel Goldsmith, resulting in her near-death. Turnick gave Goldsmith a pill that he said was Xanax, which is a prescription strength anti-anxiety medication. Goldsmith took Turnick's pill and then passed out almost immediately. (PSR ¶¶ 25-26).

Turnick drove Goldsmith to the home of his friend, Joseph Doria. Goldsmith was unconscious in the front seat when Turnick arrived at Doria's house. Doria and his mother attempted to aid Goldsmith. Turnick did not help. (PSR ¶ 27). Emergency responders arrived at the scene and administered chest compressions and medicine to Goldsmith, saving her life. Goldsmith regained consciousness and was taken to Montefiore Nyack Hospital, where she eventually recovered. (PSR ¶ 28).

The law enforcement officers at the house interviewed Turnick. Rather than provide the officers with information about the narcotics that he had given to Goldsmith, Turnick told the officers that he did not know what Goldsmith had ingested. (PSR ¶ 29).

5

### 4. The Death of Ione Koenig

Several months later, in July 2021, Turnick provided fentanyl to eighteen-year-old Ione Koenig. On July 29, 2021, Turnick spent the night in Koenig's room in the house she shared with her mother. Turnick had been interested in Koenig romantically. That evening, Turnick brought a bag of various drugs, including powder he described as heroin, to Koenig's and offered them to her. Koenig took the heroin that Turnick had offered, and it poisoned her. Turnick needed to administer Narcan, an anti-opioid medicine, to revive Koenig. (PSR ¶¶ 33-34).

On July 30, 2021, Turnick returned to Koenig's house to spend the night there again and offered Koenig more drugs, including fentanyl-laced heroin. In the early morning hours of July 31, Koenig began to experience another fentanyl poisoning caused by Turnick's drugs. Turnick eventually told Koenig's mother that Koenig was unresponsive in her room and asked Koenig's mother for more anti-opioid medicine. Koenig's mother ran down to Koenig's room and found Koenig lying on her bed. Koenig had died from a fentanyl poisoning. (PSR ¶¶ 37-38).

After Koenig was pronounced dead, law enforcement officers examined her bedroom and saw that it had recently been cleaned. Officers interviewed Turnick on the front porch of the Koenig residence. Turnick admitted that he was with Koenig the night she died, but he denied that either he or Koenig took any heroin or pills. (PSR ¶¶ 39-40). In the days and weeks after Koenig's death, Turnick told people various false stories about the night she died. (*See* PSR ¶ 42).

6

### 5.  The Poisoning of Joseph Doria

About nine months later, Turnick gave more drugs to his twenty-three-year-old friend, Joseph Doria. Doria and Turnick frequently did drugs together, and Doria knew Turnick to sell several different types of narcotics. (PSR ¶ 44).

On April 18, 2022, Doria, who had been sober for almost a year, contacted Turnick to obtain Xanax. Turnick replied that he did not have any Xanax but had heroin instead. Doria later met Turnick at Turnick's house, where Turnick gave Doria powder heroin and warned Doria that the drugs had been mixed with fentanyl. Turnick and Doria each snorted some of the heroin. (PSR ¶ 45). Turnick then gave Doria the rest of the heroin to take home. When he got home, Doria snorted the rest of the bag of fentanyl-laced heroin and lost consciousness. (PSR ¶ 46). Doria was hospitalized for fentanyl poisoning but survived the incident. (PSR ¶47).

### B.  Turnick's Guilty Plea

On August 6, 2024, Turnick pled guilty, pursuant to a written plea agreement, to the one-count Information charging him with conspiring to distribute forty grams and more of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). (A. 17-54). In the plea agreement, Turnick stipulated that his narcotics distribution resulted in the deaths and non-fatal poisonings of Olsen, Shashoua, Goldsmith, Koenig, and Doria, and that his offense level under the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") should account for those poisonings. (A. 50). The

7

parties agreed that the total Guidelines offense level for Turnick's conduct was 35. (A. 50).

The parties also stipulated in the plea agreement that Turnick had three criminal history points and was in Criminal History Category II. The plea agreement noted that Turnick had two prior criminal sentences: (1) a sentence of fifteen days' imprisonment for a conviction in Clarkstown Town Court for driving while ability impaired by the consumption of alcohol, in violation of N.Y. Vehicle & Traffic Law § 1192(1) (the "DWAI Conviction"); and (2) a sentence principally of two years' imprisonment in Rockland County Court for several narcotics and firearms convictions. (A. 50-51). The parties agreed that the sentence stemming from Turnick's firearms and narcotics convictions warranted three criminal history points. (A. 50-51). The parties further agreed, pursuant to U.S.S.G. § 4A1.2(c)(1), that the DWAI Conviction should be awarded zero criminal history points. (A. 50).

With a Guidelines offense level of 35 and a Criminal History Category of II, the parties calculated that Turnick's Guidelines range was 188 to 235 months' imprisonment (the "Stipulated Guidelines Range"). (A. 51). Turnick acknowledged both in the plea agreement and at his change-of-plea hearing that he knew that "neither the Probation Office nor the Court [was] bound by the . . . Guidelines stipulation" in the plea agreement. (A. 52; *see* A. 37). Turnick affirmed that he understood that, "regardless of what [he] and the government ha[d] agreed to [in the plea agreement]," the District Court was "going to make [its] own

8

determination as to what [Turnick's] [G]uidelines range [was]." (A. 37). Turnick further agreed in writing that the Government could "answer any inquiries and . . . make all appropriate arguments" if the Court or the Probation Office "contemplate[d] any Guidelines . . . calculations different from" the calculations in the plea agreement. (A. 52).

## C. The Sentencing Proceeding

In anticipation of Turnick's sentencing, the Probation Office prepared the Presentence Report. The Probation Office agreed with the parties' Guidelines calculations in all respects but one: Unlike the parties, the Probation Office determined that the DWAI Conviction should be assessed one criminal history point pursuant to U.S.S.G. §§ 4A1.1(c), 4A1.2(e)(2), and Application Note 5 to U.S.S.G. § 4A1.2. (PSR ¶¶ 66, 134). The Probation Office noted that the DWAI Conviction arose from Turnick's driving a motor vehicle and striking an object while he was under the influence of alcohol and narcotics. (PSR ¶ 66). Accordingly, the Probation Office calculated that Turnick had four criminal history points, placing him in Criminal History Category III, one category higher than the parties had calculated in the plea agreement. (PSR ¶¶ 66-69, 134). The Probation Office therefore determined that Turnick's Guidelines sentencing range was 210 to 262 months' imprisonment, rather than the parties' Stipulated Guidelines Range of 188 to 235 months' imprisonment. (PSR ¶¶ 133-34).

Turnick did not file any objections to the PSR with the Probation Office. (*See* PSR at 28). But in his

9

sentencing memorandum filed with the District Court, Turnick argued that the Probation Office had erred in assigning an additional criminal history point to his DWAI Conviction principally because driving-while-ability-impaired offenses under Section 1192(1) "are infractions of a non-criminal traffic law provision." (A. 66-67). Turnick requested a sentence of 102 months' imprisonment. (A. 57).

In its sentencing memorandum, the Government sought "a Stipulated Guidelines Range sentence of 235 months' imprisonment." (A. 79). The Government noted that the parties and the Probation Office had reached different conclusions about the treatment of the DWAI Conviction for Turnick's criminal history calculation. (A. 86-87). But the Government made clear that, notwithstanding the Probation Office's view of Turnick's DWAI Conviction, the Government was "stand[ing] by its stipulation in the plea agreement" that Turnick was in Criminal History Category II, and thus that his Guidelines sentencing range was 188 to 235 months' imprisonment. (A. 87 n.6).

Turnick was sentenced on February 20, 2025. (A. 93-181). At the outset of the sentencing hearing, the District Court confirmed that it had reviewed the parties' plea agreement, the parties' written sentencing memorandums and associated exhibits, and the Presentence Report. (A. 94-95). The District Court then reviewed the Probation Office's calculation of the Guidelines sentencing range, noting the disagreement about the DWAI Conviction, and confirmed that the parties did not object to any of the factual findings in the Presentence Report, including the Probation

10

Office's description of the conduct that led to the DWAI Conviction. (A. 96-97). The District Court next asked the Government if it objected "to the Guidelines calculation or to anything else in the [Presentence Report]." (A. 97-98). The Government replied, "We do not." (A. 98). The District Court also heard from Turnick's counsel on the issue of whether the DWAI Conviction should receive one criminal history point. (A.98).

The District Court then ruled that the DWAI Conviction should receive one criminal history point, as recommended by the Probation Office. (A. 98-103). The District Court rejected Turnick's argument that Section 1192(1) offenses are categorically excluded from criminal history calculations because they are not criminal convictions. (A. 99). The District Court then analyzed the DWAI Conviction under *United States v. Potes-Castillo*, 638 F.3d 106 (2d Cir. 2011), the text of U.S.S.G. § 4A1.2(c)(1), and both the pre- and post-2012 Application Notes to U.S.S.G. § 4A1.2(c)(1). (A. 99-102). The District Court concluded that Turnick's DWAI, which undisputedly arose from his "actually driving [a motor vehicle] while impaired," was sufficiently serious that it should be accorded one criminal history point under U.S.S.G. § 4A1.2(c)(1). (A. 101). The District Court determined accordingly that Turnick was in Criminal History Category III, and that the proper Guidelines sentencing range was 210 to 262 months' imprisonment, as set forth in the Presentence Report. (A. 103).

The District Court next heard argument from the parties about the appropriate sentence. (A. 102-64). As it had done in its written sentencing submission, the

11

Government stated repeatedly during oral argument that it was seeking a sentence of 235 months' imprisonment, which was within the Stipulated Guidelines Range set forth in the plea agreement. (A. 103; *see* A. 111).[3] Following the Government's argument, the parents of Jonathan Shashoua, Ione Koenig, and Gustaf Olsen gave lengthy victim impact statements. (A. 111-57). Turnick's counsel and Turnick himself then addressed the Court. (A. 157-64).

The District Court sentenced Turnick principally to 262 months' imprisonment. (A. 164-79). The District

---

[3] During this argument, the Court asked the Government: "Were you aware at the time you entered into this guilty plea about the DWAI, the driving under the influence, or is that something that the Government didn't know about?" (A. 103). The Government replied, "No, we weren't aware of that, Your Honor." (A. 103-04). It appears that the Government either misheard or misunderstood the question. The Government clearly did know at the time of the plea agreement that the DWAI Conviction existed, as that sentence is described in the written plea agreement. (*See* A. 50). The Government did not know at the time of the plea agreement any of the facts underlying the DWAI Conviction, which impacted whether that sentence would be included in Turnick's criminal history score. The Government learned about those underlying facts from the Presentence Report. (*See* PSR ¶ 66 (citing a "case summary report obtained from Clarkstown Police Department" for the description of Turnick's DWAI Conviction)).

12

Court cited in particular the "heart-wrenching" impact of Turnick's crime and the weight of the victim impact statements, among other reasons, in support of its sentence. (A. 168-69). The District Court also balanced Turnick's "profound" personal history and characteristics, which involved a particularly challenging upbringing. (A. 168-71). But ultimately, the District Court explained that "[t]his is one of the sad[d]est cases" it had seen, and that a sentence at the top of the applicable Guidelines range was appropriate. (A. 173).

## A R G U M E N T

### POINT I

### The District Court Did Not Err in Finding that Turnick's DWAI Conviction Warranted One Criminal History Point Under U.S.S.G. § 4A1.2(c)

Turnick argues that the District Court erred in concluding that his DWAI Conviction warranted a criminal history point under U.S.S.G. § 4A1.2(c)(1). (Br. 11-24). He claims that, to affirm the judgment below, the Court would need to decide whether the U.S. Sentencing Commission overruled this Court's precedent interpreting U.S.S.G. § 4A1.2(c)(1) in subsequent revisions to the Guidelines' Application Notes. (Br. 17-24). Although the Court could affirm on that basis, it need not reach that question. Even under this Court's existing caselaw, the District Court's treatment of the DWAI Conviction for Turnick's criminal history score was not error because the court

13

appropriately applied U.S.S.G. § 4A1.2(c)(1) to the facts of this case.

## A. Factual and Statutory Background

The DWAI Conviction stems from a single-vehicle accident that occurred in Clarkstown, New York, on June 3, 2022. That evening, police officers responded to an emergency call of a vehicle accident with physical injuries. The responding officers observed a black Nissan sedan that had driven off the road and sustained severe damage. Turnick was the sole occupant of the damaged vehicle. Officers found him seated in the driver's seat with the airbag deployed. Turnick was conscious and had lacerations to his head, face, and arms. (PSR ¶ 66).

The officers interviewed Turnick at the scene. He stated that he had been at a friend's house and was driving home when he fell asleep and drove into an object. Turnick believed that he was driving on an entirely different road from the one where the officers found him. The officers observed Turnick exhibiting symptoms of narcotics intoxication, including pinpoint pupils, slurred speech, and extreme disorientation. The officers found heroin, marijuana, and drug paraphernalia in Turnick's vehicle. Turnick was transferred to a hospital, where doctors administered anti-opioid medication to prevent him from losing consciousness. (PSR ¶ 66). Turnick pled guilty in the Clarkstown Town Court to driving while ability impaired, in violation of N.Y. Vehicle & Traffic Law § 1192(1), and was sentenced to fifteen days' imprisonment. (PSR ¶ 66).

14

Section 1192(1) provides: "No person shall operate a motor vehicle while the person's ability to operate such motor vehicle is impaired by the consumption of alcohol." Although Section 1192(1) is often colloquially described as "driving" while ability impaired, the statutory term "operate" is defined more broadly. It means "the act of using the mechanism of the automobile," which encompasses a range of conduct from driving the vehicle to simply igniting the vehicle's engine for the purpose of driving. *New York v. O'Connor*, 607 N.Y.S.2d 856, 858 (Nassau Cty. Dist. Ct. 1994); *accord New York v. Marriot*, 37 A.D.2d 868, 868 (N.Y. App. Div. 1971) ("[A] person operates a motor vehicle when he begins to use the mechanism of the automobile for the purpose of putting the automobile in motion even though he does not move it."). The statutory term "impaired" similarly includes a range of circumstances, including operating an automobile while one's ability to drive is impaired "to any extent," *New York v. Lizzio*, 178 A.D.2d 741, 742 (N.Y. App. Div. 1991), operating an automobile when one's blood-alcohol content is 0.08% or higher, and operating an automobile while one's "judgment and ability . . . are adversely affected to a substantial degree," *New York v. Miller*, 373 N.Y.S.2d 312, 313-14 (Webster Town Ct. 1975).

## B.   Applicable Law

Section 4A1.2(c) of the Guidelines sets rules for determining whether a "prior sentence[ ]" is counted in a defendant's criminal history score. All felony offenses are counted. U.S.S.G. § 4A1.2(c). Misdemeanors are counted only if, as relevant here, the offense is not listed in U.S.S.G. §§ 4A1.2(c)(1) or (2) and is not

15

"similar to" any offense listed in those provisions. U.S.S.G. §§ 4A1.2(c)(1), (2); *see United States v. Ubiera*, 486 F.3d 71, 74-76 (2d Cir. 2007). One of the offenses listed in § 4A1.2(c)(1) is "careless or reckless driving," so an offense is not counted if it is "similar to" that offense.[4]

To determine whether a prior offense is "similar to" an offense listed in U.S.S.G. §§ 4A1.2(c)(1) or (2), a sentencing court must use its "common sense," U.S.S.G. § 4A1.2 Application Note 12(A), to determine whether the prior offense is "categorically more serious" than a listed offense, *United States v. Morales*, 239 F.3d 113, 118 (2d Cir. 2000).[5]

The commentary to the Guidelines suggests that a sentencing court conducting a "similar to" analysis under U.S.S.G. § 4A1.2(c) consider, among other factors, the "punishments imposed for the listed and unlisted

---

[4] The offense may still be counted if "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." U.S.S.G. § 4A1.2(c). That provision is inapplicable here, because the DWAI Conviction was not similar to the instant offense and Turnick was sentenced to less than 30 days' imprisonment.

[5] Use of the phrase "categorically" does not mean the use of the categorical approach by which elements of an offense are analyzed. The term here means "without qualification or reservation." *United States v. Valente*, 915 F.3d 916, 921 (2d Cir. 2019).

16

offenses," the "seriousness of the offense," "the elements of the offense," the defendant's "level of culpability involved," and "the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct." *Id.*; *see also United States v. De-Jesus-Concepcion*, 607 F.3d 303, 304-05 (2d Cir. 2010) (summarizing guidelines commentary). But the commentary to U.S.S.G. § 4A1.2(c) merely "identifies the factors . . . that a district court *may* consider"; it does not require the court to consider all, or any, of those factors specifically. *Valente*, 915 F.3d at 922. Indeed, a sentencing court is not even required "to explicitly indicate that it considered the . . . factors [in the Guidelines' commentary] or assign any one of them particular weight." *Id.* A sentencing court conducting a "similar to" analysis may consider "any . . . factor the court reasonably finds relevant in comparing prior offenses and [the listed offenses]." *United States v. Martinez-Santos*, 184 F.3d 196, 206 (2d Cir. 1999); *see Morales*, 239 F.3d at 118 (adopting the Fifth Circuit's "common sense approach which relies on all possible factors of similarity"). That includes "the actual conduct involved and the actual penalty imposed" for the prior offense. *Ubiera*, 486 F.3d at 75.

This Court reviews a sentencing court's "interpretation of the Sentencing Guidelines de novo, but review[s] its related findings of fact only for clear error." *Potes-Castillo*, 638 F.3d at 108-09. When reviewing a district court's application of U.S.S.G. § 4A1.2(c) to a defendant's prior offense, the Court applies de novo review if the prior offense "punishes only one basic form of conduct," but shows "due deference" to the district court's decision when the prior offense punishes "a

17

range of conduct" and thus requires "a sentencing judge . . . to apply[] the guideline to the facts" of the defendant's case. *Morales*, 239 F.3d at 117-18; *see* 18 U.S.C. § 3742(e) ("The court of appeals . . . shall give due deference to the district court's application of the guidelines to the facts."); *DeJesus-Concepcion*, 607 F.3d at 305 (when the "similar to" analysis "necessarily focus[es] on the particular conduct of the defendant," the "due deference" standard of review applies). "Typically, the pre-sentence report will sufficiently acquaint the sentencing judge with the circumstances of the prior offense" to make findings about whether the offense is "similar to" those listed in U.S.S.G. § 4A1.2(c)(1) or (2). *Morales*, 239 F.3d at 118.

## C. Discussion

The District Court did not err in deciding that the DWAI Conviction was sufficiently serious to warrant a criminal history point under U.S.S.G. § 4A1.2(c).

### 1. The District Court Did Not Err Under the Current Sentencing Guidelines' Application Notes

This Court could affirm the judgment on the ground that the District Court's decision to count the DWAI Conviction in Turnick's criminal history score was consistent with the Sentencing Commission's current guidance for applying U.S.S.G. § 4A1.2.

As the District Court recognized (A. 99-101), there is presently some uncertainty in this Circuit about how to apply U.S.S.G. § 4A1.2(c) to a prior sentence for operating a vehicle while ability impaired in violation

18

of Section 1192(1). *See United States v. Valente*, 688 F. App'x 76, 78 (2d Cir. 2017) (acknowledging this uncertainty). In *United States v. Potes-Castillo*, 638 F.3d 106 (2d Cir. 2011), this Court held that sentencing courts must assess on a case-by-case basis whether a defendant's Section 1192(1) conviction is "similar to" an offense listed in U.S.S.G. § 4A1.2(c)(1) before including the conviction in the criminal history score. *Id.* at 114. That decision split with those of several other Courts of Appeals, which had all held categorically that alcohol-related traffic offenses *always* count in the criminal history score. *See United States v. Pando*, 545 F.3d 682, 683-85 (8th Cir. 2008); *United States v. Thornton*, 444 F.3d 1163, 1165-67 (9th Cir. 2006); *United States v. LeBlanc*, 45 F.3d 192, 195 (7th Cir. 1995); *United States v. Deigert*, 916 F.2d 916, 918 (4th Cir. 1990).

*Potes-Castillo* largely turned on the Court's interpretation of the version of Application Note 5 to U.S.S.G. § 4A1.2 that was applicable in 2011. That version of Application Note 5 did not, on its face, categorically remove DWAI offenses from the ambit of U.S.S.G. § 4A1.2(c). Rather, the note stated that alcohol-related traffic offenses "are counted" and "are not minor traffic infractions" within the meaning of Section 4A1.2(c)(2). *Potes-Castillo*, 638 F.3d at 110. This Court held that reading the "are counted" language in Application Note 5 categorically to count all DWAI offenses in a criminal history score regardless of U.S.S.G. § 4A1.2(c) would render the clause "are not minor traffic infractions" superfluous. *Id.* at 111-12. The Court thus concluded that Application Note 5 should be read merely to indicate that DWAI offenses are not similar to the "minor traffic infractions" that

19

are never counted under U.S.S.G. § 4A1.2(c)(2), but that these offenses remained subject to analysis under U.S.S.G. § 4A1.2(c)(1), including the possibility that particular convictions would be sufficiently "similar to . . . careless or reckless driving" that they should not be counted.

In 2012, the U.S. Sentencing Commission amended Application Note 5 to U.S.S.G. § 4A1.2 with the express purpose of abrogating *Potes-Castillo. See* U.S.S.G. Supp. to App'x C, Amendment 766, at 16-17 (explaining Commission's intention to abrogate *Potes-Castillo* as contrary to the Commission's intent and an outlier decision among the Courts of Appeals). As the District Court noted below (A. 100), the current version of Application Note 5 now states: "Convictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) are always counted, without regard to how the offense is classified. Paragraphs (1) and (2) of §4A1.2(c) do not apply."

This language makes clear the Commission's view that offenses like Turnick's "always" should be "counted," and that U.S.S.G. §§ 4A1.2(c)(1) and (2) "do not apply" to such convictions at all. In other words, the Commission has now clarified that, in its judgment, offenses involving alcohol and the operation of motor vehicles are always more serious than the offenses listed in U.S.S.G. §§ 4A1.2(c)(1) and (2) and should therefore always count for criminal history. *See* U.S.S.G. Supp. to App'x C at 16 ("This amendment reflects the Commission's view that convictions for driving while intoxicated and other similar offenses are

20

sufficiently serious to always count toward a defendant's criminal history score."). In short, after this Court in *Potes-Castillo* concluded that the prior version of Application Note 5 was "ambiguous," 638 F.3d at 110, the Sentencing Commission amended the Application Note to cure the perceived ambiguity and make it clear that these types of offenses should be counted toward a defendant's criminal history. The District Court did not err under the Commission's current guidance when it counted Turnick's DWAI Conviction in his criminal history score.

Turnick's contrary arguments are unavailing. He claims that *Potes-Castillo* remains controlling even after the amendment to Application Note 5 because he claims that decision turned on the unambiguous text of U.S.S.G. § 4A1.2(c) itself, which the Commission did not change. (Br. 17, 19). Specifically, Turnick argues that the text "[s]entences for all felony offenses are counted" in U.S.S.G. § 4A1.2(c) makes unambiguously clear that felonies are the only types of convictions that are "always counted" in a defendant's criminal history score. (Br. 19 (quoting *United States v. Perez*, No. 24 Cr. 368, 2025 WL 2047829, at \*7 (S.D.N.Y. July 22, 2025))). That misreads both U.S.S.G. § 4A1.2(c) and *Potes-Castillo*. This Court did not hold that any text in U.S.S.G. § 4A1.2(c) was so unambiguously clear that the Guideline required no interpretive assistance from the Commission's application notes. Rather, *Potes-Castillo* closely analyzed the language of the then-existing Application Note 5 to decide how to interpret the language in U.S.S.G. § 4A1.2(c). *See* 638 F.3d at 110-13. The Court found it necessary to conduct that analysis precisely because the language of U.S.S.G.

21

§ 4A1.2(c) is ambiguous and requires courts to engage in an open-ended exercise of comparing a defendant's prior misdemeanor or petty offense to lists of other offense types. That exercise is plainly amenable to "interpret[ation]" and "expla[nation]" through guidance from the Commission. *See Stinson v. United States*, 508 U.S. 36, 38 (1993). In 2012, the Commission amended Application Note 5 to provide additional interpretation and explanation, which now clearly requires the DWAI Conviction here to be counted.

Turnick also claims that his DWAI Conviction is not covered by the post-2012 version of Application Note 5. (Br. 17-20). In Turnick's view, a Section 1192(1) conviction is not a "[c]onviction[ ] for driving while intoxicated or under the influence" or a "similar offense[ ]," U.S.S.G. § 4A1.2(c) cmt. (n.5), because it is a traffic infraction that one may commit without actually driving a car. But Section 1192(1) was also the statute at issue in *Potes-Castillo*, 638 F.3d at 108—the decision that presented the exact set of facts that the Commission designed the 2012 amendment to Application Note 5 to capture. *See* U.S.S.G. Supp. to App'x C at 16. The Commission thus clearly intended the current version of Application Note 5—which covers both "driving while . . . under the influence" offenses and any "similar offense[ ]"—to apply to operating an automobile while ability impaired, in violation of Section 1192(1).

22

### 2. The District Court Did Not Err Under the Approach Outlined in *Potes-Castillo*

Although the Court could affirm the judgment below on the basis that *Potes-Castillo* did not survive the 2012 amendment to Application Note 5 of U.S.S.G. § 4A1.2(c), this case does not require such a pronouncement because the District Court's analysis was also consistent with *Potes-Castillo*. *See Valente*, 688 F. App'x at 78-79 (declining to address the impact of the 2012 amendment on *Potes-Castillo* because the sentencing court correctly applied existing precedent). Here, as required by *Potes-Castillo*, the District Court assessed the severity of the particular conduct that led to Turnick's DWAI Conviction and determined that it was sufficiently serious to warrant a criminal history point. This Court should defer to that decision.

### a. The Due Deference Standard of Review Applies

As an initial matter, the District Court's analysis of the severity of Turnick's DWAI Conviction should be afforded due deference on appeal because Section 1192(1) prohibits "a range of conduct" rather than "one basic form of conduct." *Morales*, 239 F.3d at 118; *see also* U.S.S.G. Supp. to App'x C at 15 ("Convictions for driving while intoxicated and similar offenses encompass a range of offense conduct.").

Section 1192(1)'s flexibility derives principally from the capaciousness of its statutory terms "operate" and "impaired." At one extreme, because the term "operate" does not require a person to actually drive a vehicle, Section 1192(1) could apply "if a person were to

23

have a few drinks" and simply "sit in the [driver's] seat of a car to sleep it off" with the keys in the ignition. *United States v. Paredes*, 185 F. Supp. 3d 287, 289 (E.D.N.Y. 2016); *see United States v. Walia*, No. 14 Cr. 213, 2016 WL 4257347, at *1 (E.D.N.Y. Aug. 11, 2016). Because the term "impaired" includes impairment to any degree, Section 1192(1) could apply on those facts even if the person sleeping in the driver's seat had a blood-alcohol content was below 0.08%. *See Miller*, 373 N.Y.S.2d at 313-14. At the other extreme, however, Section 1192(1) also applies when a person drives a motor vehicle on the public street while they are so intoxicated that they cannot remain awake and then collides with an object, causing physical injuries, as Turnick did. That is because, although not necessary for a Section 1192(1) violation, driving and crashing a vehicle is sufficient to satisfy the "operat[ing]" requirement, and driving when one's judgment is substantially impaired by alcohol likewise is sufficient to satisfy the "impair[ment]" requirement.

Locating where a prior Section 1192(1) conviction falls on the spectrum of conduct to which the statute applies thus necessarily requires a sentencing court to evaluate the particular facts of a defendant's case. *See DeJesus-Concepcion*, 607 F.3d at 305. For this reason, the Court has repeatedly afforded deference to district courts' decisions about whether particular convictions for driving while ability impaired and other like offenses were "similar to" the offenses listed in U.S.S.G. §§ 4A1.2(c)(1) and (2). *E.g.*, *Valente*, 915 F.3d at 921-22 (deference afforded to sentencing court's assessment of an offense for "failing to use a vehicle with an interlock device"); *Valente*, 688 F. App'x at 78-79 (deference

24

afforded to sentencing court's assessment of a Section 1192(1) offense); *DeJesus-Concepcion*, 607 F.3d at 305-06 (deference afforded to sentencing court's assessment of a misdemeanor for unauthorized use of a vehicle); *cf. Potes-Castillo*, 638 F.3d at 133 (remanding to the district court to decide "in the first instance whether [a Section 1192(1)] conviction should be counted or excluded under [U.S.S.G. § ]4A1.2(c)(1)").

Turnick acknowledges the due deference standard (Br. 11-12) and weakly suggests that it should not apply here (*see* Br. 16-17 (noting only that a "non-precedential . . . summary order [did] not provide any explanation as to how New York's DWAI statute could be said to punish a 'range of conduct'")). But at other points, Turnick essentially admits that Section 1192(1) can cover various forms of impaired operation of an automobile when he describes, and repeatedly relies upon, the breadth of the statutory terms "operate" and "impaired." (*See* Br. 12-13, 21-22). Turnick's recognition of the breadth of Section 1192(1) is a tacit admission that the due deference standard of review applies.

**b.      The District Court Did Not Err in Concluding that Turnick's DWAI Conviction Was Not Similar to the Offenses Listed in U.S.S.G. § 4A1.2(c)(1) and (2)**

Affording due deference to the District Court's application of U.S.S.G. § 4A1.2(c) to the facts of this case, it was not error for the court to count the DWAI Conviction in Turnick's criminal history score. In

25

assessing the seriousness of Turnick's Section 1192(1) offense, the District Court cited the facts of Turnick's prior conduct, which included "actually driving while impaired by alcohol" and striking an object with his car, as set forth without objection in the Presentence Report. (A. 101). Judge Halpern considered the Sentencing Commission's judgment that intoxicated-driving offenses are sufficiently serious to be counted in a defendant's criminal history score, as reflected in the amended Application Note 5 and the Commission's explanation for that amendment. (A. 101; *see* U.S.S.G. Supp. to App'x C at 16 ("This amendment reflects the Commission's view that convictions for driving while intoxicated and other similar offenses are sufficiently serious to always count toward a defendant's criminal history score.")). Judge Halpern also cited the persuasive opinion of another district judge, who had reached the same conclusion regarding the inclusion of Section 1192(1) convictions in a defendant's criminal history score. (A. 101-02 (citing *Gonzalez v. United States*, No. 14 Civ. 8760, 2016 WL 270451, at *3 (S.D.N.Y. Jan. 21, 2016)).

That decision was reasonable. In conducting its "common sense" analysis of the seriousness of the DWAI Conviction, U.S.S.G. § 4A1.2 Application Note 12(A), the District Court could consider "any . . . relevant factor," *DeJesus-Concepcion*, 607 F.3d at 305. It was appropriate for Judge Halpern here to focus on the severity of the conduct that led to Turnick's DWAI Conviction. Turnick's conviction under Section 1192(1) was for drinking and using narcotics to such a degree that he lost consciousness while driving his car, crashed his vehicle, and caused physical injuries. That

26

is an extreme set of facts that is plainly far more serious than merely driving carelessly or recklessly. Moreover, even if he were not *required* to follow the Sentencing Commission's post-2012 amendment to Application Note 5, Judge Halpern certainly was *permitted* to consider the Commission's explanation of the reasons for that amendment when applying U.S.S.G. § 4A1.2(c) to Turnick's case. Judge Halpern also accurately noted that his decision to count the DWAI Conviction was in accord with the decisions of other courts in this Circuit that have counted similar offenses. *See, e.g.*, *United States v. Luizzi*, No. 24-2708, 2025 WL 2992462, at \*3-4 (2d Cir. Oct. 24, 2025); *Valente*, 688 F. App'x at 78-79.[6]

Turnick's efforts to convince the Court to reverse the judgment below notwithstanding the deferential

———————

[6] As Turnick notes (Br. 23-24), and as Judge Halpern acknowledged (A. 101), there are also cases in which courts have declined to count convictions for driving while ability impaired in criminal history calculations. The offense-comparison task that U.S.S.G. § 4A1.2(c) contemplates, with its non-exhaustive multi-factored analysis, will inevitably yield different results based on the circumstances of each individual case. Deciding how U.S.S.G. § 4A1.2(c) applies to the facts of a particular case is generally the work of the sentencing judge, not this Court. *See* 18 U.S.C. § 3742(e). The fact that judges in other cases have reached different results based on the facts of those cases is not a reason to vacate Judge Halpern's application of U.S.S.G. §4A1.2(c) to the facts of this case.

27

standard of review fail. He asks the Court to blind it-self to the circumstances of his DWAI Conviction and to assess the seriousness of his offense considering only "run-of-the-mill" Section 1192(1) violations. (Br. 21). Turnick further suggests that it was inappropriate for the District Court to factor the underlying facts of his DWAI Conviction into its U.S.S.G. § 4A1.2(c) analysis and to weigh those facts more heavily than other considerations, such as the potential sentences available under Section 1192(1). (Br. 21-23). But a sentencing judge is clearly permitted to consider "the actual conduct involved" in a prior offense when assessing the offense's seriousness under U.S.S.G. § 4A1.2(c), *Ubiera*, 486 F.3d at 75, and a court is not required to consider any particular set of factors, "to explicitly indicate that it considered" any set of factors, "or [to] assign any [factor] particular weight," *Valente*, 915 F.3d at 922. A sentencing court can weigh "any" factor that is relevant to the seriousness of the prior offense. *DeJesus-Concepcion*, 607 F.3d at 305.

This case exemplifies why it is appropriate to consider the underlying facts of a defendant's prior offense. As explained, Turnick's was not a standard Section 1192(1) violation. Turnick's offense, as described in the Presentence Report, involved the extraordinarily reckless conduct of driving while literally asleep at the wheel due to alcohol and narcotics abuse, which resulted in injuries to Turnick and posed a serious risk to pedestrians and other drivers.[7] The District Court

---

[7] Turnick suggests that it was inappropriate for the District Court to rely on the Presentence Report to

28

could fairly consider and weigh that prior conduct heavily, particularly because the court was now sentencing Turnick for exhibiting extreme, narcotics-related recklessness in selling fentanyl that killed three people and nearly killed two others.

Taking those underlying facts into account rather than viewing Section 1192(1) in the abstract, the additional factors Turnick cites counsel in favor of counting his prior sentence in his criminal history score. (Br. 21-22). In light of the heroin found in his damaged car and the apparent combination of alcohol and drugs in his system, Turnick could have been sentenced to a far longer term of imprisonment than the fifteen days permitted by Section 1192(1) or the thirty days permitted by New York's reckless driving law. *See, e.g.*, N.Y. Vehicle & Traffic Law §§ 1192(4)(a), 1193(1)(b) (driving while ability impaired by the combination of alcohol and drugs punishable by up to one year of imprisonment). This case involved an extreme risk of danger to others (more than the mere "unreasonable endangerment" of others that is required for reckless driving) because Turnick fell unconscious while he was driving. (Br. 22). And Turnick was an unusually

---

learn the circumstances of his DWAI Conviction. (Br. 22-23). But at his sentencing hearing, Turnick waived any objection to the factual statements in the Presentence Report. (A. 97). In any event, this Court has held that presentence reports "[t]ypically ... will sufficiently acquaint the sentencing judge with the circumstances of the prior offense." *Morales*, 239 F.3d at 118.

29

culpable Section 1192(1) violator because of the severity and causes of his intoxication and the fact that he drove and crashed his car while intoxicated. Those factors all support Judge Halpern's finding that Turnick's Section 1192(1) offense was sufficiently serious to count in Turnick's criminal history score.

## POINT II

## The Government Did Not Breach the Plea Agreement

Turnick's unpreserved claim the Government breached the plea agreement because it did not orally object to the Probation Office's Guidelines analysis is equally meritless. (Br. 25-30). The Government stated clearly in its sentencing submission that it was "stand[ing] by its stipulation in the plea agreement" (A. 87 n.6), and the Government requested both in its sentencing submission and orally at sentencing that the District Court impose a sentence within the Stipulated Guidelines Range set forth in the plea agreement (A. 88, 103). The plea agreement did not require the Government to do anything more.

### A.   Applicable Law

This Court "review[s] interpretations of plea agreements de novo and in accordance with principles of contract law." *United States v. Wilson*, 920 F.3d 155, 162 (2d Cir. 2019) (quoting *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002)). "To determine whether a plea agreement has been breached," the Court "look[s] to the reasonable understanding of the parties as to the terms of the agreement." *Riera*, 298 F.3d at 133.

30

"Because the government ordinarily has certain awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." *Id.* "Given the government's often decisive role in the sentencing context, [this Court] will not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness." *United States v. Lawlor*, 168 F.3d. 633, 637 (2d Cir. 1999).

Notwithstanding this stringent scrutiny of the Government's compliance with plea agreements, the Court has "not established a bright-line rule as to the leeway the government has with respect to what it tells the court while operating under a plea agreement." *United States v. Taylor*, 961 F.3d 68, 82 (2d Cir. 2020). Rather, it has recognized that each case "must be carefully studied in context" to determine whether the Government has apparently sought "to influence the [district] court in a manner incompatible with the agreement." *United States v. Amico*, 416 F.3d 163, 167 n.2 (2d Cir. 2005).

In general, the remedy for a breach of a plea agreement is either to allow the wronged party to withdraw from the agreement or insist on specific performance. *See Lawlor*, 168 F.3d at 638; *United States v. Cimino*, 381 F.3d 124, 127-28 (2d Cir. 2004). But not every breach requires a remedy; a "de minimis breach exception" applies when "the violation is so minor that it does not cause the defendant to suffer any meaningful detriment." *United States v. Vaval*, 404 F.3d 144, 155 (2d Cir. 2005).

31

An unpreserved claim that the Government breached a plea agreement is reviewable only for plain error. *See Puckett v. United States*, 556 U.S. 129, 143 (2009); *United States v. MacPherson*, 590 F.3d 215, 218-19 (2d Cir. 2009). To preserve a claim of breach, a defendant must, if given an opportunity to object, "inform[] the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b); *see Puckett*, 556 U.S. at 135-36 (discussing Rule 51(b) and concluding that "plain-error review applies when a defendant fails to preserve a claim that the Government defaulted on its plea-agreement obligations").

Plain error is a stringent standard, requiring an appellant to demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). "For an error to be plain, it must, at a minimum, be clear under current law." *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004). This Court "typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *Id.*

32

## B. Discussion

Turnick claims that the Government breached the plea agreement solely because, after confirming in writing that it was adhering to the Guidelines calculations in the plea agreement, the Government stated at the sentencing hearing that it did not have any objection to the Guidelines calculation in the Presentence Report. (Br. 26-28). Turnick admits that this claim was not preserved below and is reviewed on appeal only for plain error. (Br. 28).

It certainly was not "clear" or "obvious" that the plea agreement obligated the Government to object to the Probation Office's Guidelines calculations. *Marcus*, 560 U.S. at 262. With respect to the Guidelines calculation, the plea agreement required the parties only to take the position that Turnick's offense level was 35, Turnick was in Criminal History Category II, and the Guidelines sentencing range was 188 to 235 months' imprisonment. (A. 50-51). The written plea agreement expressly stated that the Probation Office and the Court were not bound by the parties' Guidelines calculations and could calculate a different Guidelines range than that agreed to by the parties. (A. 52). Nothing in the agreement required either party to object to those independent calculations. Indeed, at his change-of-plea hearing, Turnick confirmed that he understood that the Court would conduct its own Guidelines calculation, and there was no discussion at that hearing about any affirmative obligation on the Government's part to object to the Court's calculations if they differed from the parties' calculations. (A. 37). Thus, the only "reasonable understanding,"

33

*Riera*, 298 F.3d at 133, Turnick could have had when he entered the plea agreement was that the agreement bound the parties' positions on the Guidelines, but the Probation Office and the Court would conduct their own analyses separate from, and unbounded by, the parties' views.

The Government discharged those duties appropriately here. The Government took the position in its sentencing submission that Turnick was in Criminal History Category II, consistent with the plea agreement. (A. 86). The Government also repeatedly asked the District Court both in writing and at the sentencing hearing to sentence Turnick within the Stipulated Guidelines Range, which assumed that Turnick was in Criminal History Category II (as the parties had agreed) not Criminal History Category III (as calculated by the Probation Office). (A. 79, 88-92, 103, 109, 111). Turnick fails to cite any language in the plea agreement or caselaw that suggests the Government was required to do anything more.[8]

---

[8] The two cases Turnick cites arose on very different facts. (Br. 27-28). In both *United States v. Amico*, 416 F.3d 163 (2d Cir. 2005), and *United States v. Palladino*, 347 F.3d 29 (2d Cir. 2003), the Government expressly adopted different positions than the positions in the plea agreement. Here, the Government stood by the plea agreement notwithstanding the Probation Office's different Guidelines calculations and requested a sentence within the Stipulated Guidelines Range.

34

Even assuming *arguendo* that the plea agreement had created an affirmative obligation to object to the Probation Office's Guidelines calculations, it is far from obvious that the Government violated that duty. At the beginning of the sentencing proceeding, Judge Halpern stated that he had read the Government's written sentencing submission (A. 95), in which the Government had explained that the parties and the Probation Office reached different conclusions regarding Turnick's Criminal History Category and had told the District Court that the Government was adhering to the position set forth in the plea agreement. Later at the sentencing hearing, Judge Halpern asked the Government if it had any objections to the Presentence Report. (A. 98). At that point, because Judge Halpern had advised the Government that he was familiar with its written submission, it was reasonable to interpret his question as asking only if there was any issue in addition to the points already contained in its written submission that the Government wanted to address. At the very least, it was not clear or obvious that the Government was required to orally reiterate its commitment to the plea agreement at the sentencing hearing when the District Court had made clear that it had read a sentencing memorandum in which the Government had expressly reaffirmed that same commitment.[9]

---

[9] Turnick wisely does not contend that the Government's defense of Judge Halpern's judgment and resolution of the U.S.S.G. § 4A1.2(c) issue on appeal to this Court is a breach of the plea agreement. The plea

35

The Government's oral advocacy for a Stipulated Guidelines Sentence of 235 months' imprisonment after Judge Halpern ruled that the correct sentencing range was 210 to 262 months' imprisonment further confirms that it did not breach the plea agreement. (A. 103, 109, 111). Even when the Government states "a few ill-advised . . . words that might . . . suggest[ ]" a sentencing position that is inconsistent with the plea agreement, it can "clear up any confusion" through subsequent statements. *Riera*, 298 F.3d at 135-36. Here, the Government's advocacy for a sentence within the Stipulated Guidelines Range after the court's higher calculation of Turnick's criminal history score clarified that the Government continued to treat the plea agreement's calculations as controlling and believed that it would be appropriate to sentence Turnick within the Guidelines range in the plea agreement. After those statements, Judge Halpern acknowledged that both parties had asked for sentences within their plea agreement, confirming that any ambiguity in the Government's position had been clarified. (A. 169). But Judge Halpern still sentenced Turnick to 262 months' imprisonment, explaining that he "believe[d] the nature and circumstances of these offenses [were] so

―――――――――

agreement permits the Government to "make all appropriate arguments" if the District Court "contemplate[d] any Guidelines . . . calculations different from" those in the plea agreement. (A. 52). Defending the judgment below is one of those "appropriate arguments."

36

heinous" and "serious," a judgment that was well within his discretion. (A. 169).

Relatedly, there was no plain error because it is far from clear that any breach by the Government here "affected the outcome of the district court proceedings." *Marcus*, 560 U.S. at 262. Turnick has not shown any reason to believe that the Government's orally reaffirming its commitment to the plea agreement's criminal history score would have changed the District Court's U.S.S.G. § 4A1.2(c) analysis. Judge Halpern knew how the parties had calculated the criminal history score in the plea agreement, and knew that his criminal history calculation was different. (*See* A. 169). It was no secret that the Government was not advocating that the DWAI Conviction should warrant a criminal history point. And yet Judge Halpern still reached the criminal history calculation that he believed was "the proper calculation." (A. 169). There is no reason to believe that outcome depended in any way on how the Government responded to Judge Halpern's question about whether it objected to anything else in the plea agreement.

Moreover, any breach of the plea agreement here was so minor that it does not require a remedy. When the Government breaches a plea agreement, "[t]he nature of the remedy varies with the nature of the broken promise and the facts of each particular case." *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989). If the "essential elements of the agreement [are] fulfilled" despite a technical breach, this Court can decline to order a remedy. *Valval*, 404 F.3d at 155 n.5 (discussing *Casamento*). That is, at most, what

37

happened here. Even if the Government's failure to orally object to the Probation Office's criminal history calculation was a breach, the essential elements of the plea agreement were preserved because the Government had already confirmed its commitment to the plea agreement in writing and advocated for a sentence that assumed the plea agreement's criminal history calculations were correct. The District Court ultimately did not follow those recommendations from the Government. But at the time Turnick entered his guilty plea, he had been told both orally and in writing that was a possibility. (A. 37, 52).

Turnick's requested remedy of reassignment to a different district judge on remand is particularly inappropriate here. (Br. 30). This Court has ordered reassignment in plea-breach cases when the Government's breach resulted in the introduction of evidence that the sentencing judge would not have considered but for the breach or affirmative advocacy by the Government for a sentencing position that was not permitted under the plea agreement. *See, e.g.*, *Wilson*, 920 F.3d at 159-61, 165 (Government introduced additional evidence and advocated for a sentence that was substantially different from the plea agreement's original Guidelines estimate); *Valval*, 404 F.3d at 152-54 (Government advocated for a particular sentence when the plea agreement prohibited it from doing so). Here, the result of the only claimed breach was a pure legal decision about how to calculate one criminal history point based on information that the Probation Office, not the Government, brought to the Court's attention. Moreover, unlike in other plea-breach cases, the Government here did not advocate for the District Court

38

to adopt the view of Turnick's criminal history that it eventually adopted; rather, it advocated for a Stipulated Guidelines Range sentence that assumed the court was wrong in its criminal history calculation. A remand in those circumstances—which are more akin to a remand after a district court makes a standard legal error than a remand following the introduction of inappropriate information because of a breach of a plea agreement—does not require reassignment to a different district judge.

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:    New York, New York
February 12, 2026

Respectfully submitted,

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*

RYAN W. ALLISON,
NATHAN REHN,
   *Assistant United States Attorneys,*
      *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 9,022 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: Nathan Rehn,
*Assistant United States Attorney*